[No. A037423. First Dist., Div. Five. June 30, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD LAVERN DANIELS, Defendant and Appellant.

**COUNSEL**

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Catherine A. Rivlin and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KING, J.—** ▇▇▇▇ In this case we hold that when the defendant forced his victim to go from a public area to a less frequented nearby location, robbed him, and, upon discovering the victim possessed a bank card, required him to accompany defendant to a bank to withdraw cash from an automated teller machine, the defendant was properly convicted of kidnapping[1] for robbery. Although scholarly opinion has been consistent in answering the question of what conduct constitutes kidnapping for robbery as opposed to robbery alone, judicial application of the rule has varied considerably as courts struggle to define the scope of the proscribed behavior. Our current rule was formulated in an era when bank cards and automated teller machines operating 24 hours a day did not exist. From the facts in this case and from reports in the daily press, we now see a scenario unfolding where victims are robbed and then forced to go to their automated teller machines to obtain additional cash. Considering how common it has become to carry bank cards, and recognizing the confusion in the application of the present rule, we urge our Supreme Court to consider the formulation of a new rule for when movement of a robbery victim causes the crime to become kidnapping for robbery, one which can be applied with greater ease and consistency.

Richard Lavern Daniels appeals a judgment of conviction for kidnapping for robbery (Pen. Code, § 209, subd. (b)), alleging insufficiency of the evidence. We affirm the judgment.

## I

### FACTS

On April 9, 1986, at 6:05 a.m., Steven Matthew Pena drove up to an ARCO Mini Market in Oakland to purchase cigarettes. Daniels, with a noticeable smell of alcohol on his breath, blocked Pena's exit from the car,

---

[1] For the sake of consistency, we shall employ the spelling used in the current statutes throughout this opinion, although earlier cases and commentaries sometimes use a single "p."

pointed a revolver at his chest and demanded money. When Pena produced only two dollars in change, Daniels got into the car, searched Pena's pockets, then directed him to drive half a block away into a residential area. There Daniels took Pena's watch, license and bank Versateller card. Upon finding the bank card, Daniels asked Pena where the nearest bank was. Pena did not answer.

Daniels then directed Pena to drive three or four blocks to a Bank of America at a local shopping mall. During the trip, Daniels poked Pena with the muzzle end of the gun every time Pena moved his head in Daniels's direction, at least a dozen times. Pena suffered a lump and abrasions but required no medical treatment.

After attempts to use Pena's card in the Versateller machine failed, Daniels approached Charles Edward Fulcher, who was using an adjacent Versateller machine, and took $21 from him at gunpoint. When Daniels's attention was diverted briefly, Fulcher noticed the gun was unloaded and jumped him. Pena retrieved a broken axe handle from his car and together he and Fulcher subdued Daniels. The police arrived and Daniels was arrested.

A jury convicted Daniels of two counts of robbery (Pen. Code, § 211) with use of a firearm (Pen. Code, § 12022.5), one count of kidnapping for robbery (Pen. Code, § 209, subd. (b)) and one count of being a convicted felon in possession of a handgun. (Pen. Code, § 12021.) In addition, Daniels admitted a prior felony conviction. (Pen. Code, § 667.) The court sentenced Daniels to life imprisonment on the kidnapping for robbery charge, with concurrent sentences of five years for the other robbery conviction, a two-year enhancement for use of the gun and a five-year enhancement for the prior felony conviction.

## II

### DISCUSSION

Penal Code section 209, subdivision (b), provides: "Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole." ■ The word "kidnaps" in section 209 means kidnapping as defined in Penal Code section 207, which provides: "(a) Every person who forcibly steals, takes, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (*People* v. *Daniels* (1969) 71 Cal.2d 1119, 1131 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].)

One commentator has noted the language "kidnaps . . . to commit robbery" is open to at least three different interpretations. (Comment, *Struggling with California's Kidnapping to Commit Robbery Provision* (1976) 27 Hastings L.J. 1335, 1337 [hereafter *Struggling with Kidnapping*].) An "automatic" application, supported by a literal reading of the statute, "would punish the kidnapping of any person during any stage of a robbery." (*Id.,* at p. 1348.) In a "restrictive" application, supported by the history of the statute and the language and purpose of a 1951 amendment, conviction could occur only if the kidnapping were essential to the robbery, i.e., the property was not in the victim's immediate possession and asportation was necessary to unite the victim with the property to be stolen. (*Id.,* at pp. 1348-1349.) A "selective" application would sanction "only those kidnappings which increase the dangers over those attributable to robbery . . . ." (*Id.,* at p. 1349.)

California courts have struggled to provide an interpretation of the scope of illegal behavior which is both just and fair. An overly broad interpretation results in injustice, in part because of the difficulty in distinguishing kidnapping for robbery from the lesser crimes of simple kidnapping (Pen. Code, § 207) and robbery (Pen. Code, § 211), and in part because the penalty for aggravated kidnapping is considerably more onerous than that for the lesser offenses combined.[2]

## A. *The Applicable Law and Its History.*

Aggravated kidnapping has been codified in California since 1901.[3] The increased number of kidnappings for ransom during prohibition and the Lindbergh kidnapping in 1932 led to a Federal Kidnapping Act[4] which proscribed kidnapping for ransom or reward but did not include kidnapping for robbery. (*Struggling with Kidnapping, supra,* at pp. 1338-1340.)

---

[2] While Penal Code section 209, subdivision (b), mandates life imprisonment with possibility of parole for kidnapping for robbery, penalties for simple kidnapping are three, five or eight years (Pen. Code, § 208), and for robbery, three, four or six years (first degree) and two, three or five years (second degree). (Pen. Code, § 213).

[3] "Every person who maliciously, forcibly, or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or robbery, or exact from the relatives or friends of such person any money or valuable thing, is guilty of a felony, and shall be punished therefor by imprisonment in the state's prison for life, or any number of years not less than ten." (Stats. 1901, ch. 83, § 1, p. 98.)

[4] "[W]hoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away by any means whatsoever and held for ransom or reward shall, upon conviction, be punished by imprisonment in the penitentiary for such term of years as the court, in its discretion, shall determine. . . ." (Act of June 22, 1932, Pub.L.No. 72-189, 47 Stat. 326, as amended, 18 U.S.C. § 1201 (Supp. IV, 1974).)

California legislators, evidently responding to the same fear, patterned 1933 amendments to the state kidnapping law[5] after the federal act by significantly increasing the penalty and the scope of illegal behavior. The new statute retained the California requirement of intent to commit robbery but omitted the need to move the victim. (*Id.*, at pp. 1340-1342.) When the California Supreme Court applied the statute to affirm an aggravated kidnapping conviction for a standstill robbery (*People* v. *Knowles* (1950) 35 Cal.2d 175 [217 P.2d 1]), the perceived injustice led to the creation in 1951 of the specific offense of kidnapping for robbery.[6] (*Struggling with Kidnapping, supra,* at pp. 1343-1347.) A later amendment separated kidnapping for robbery from the rest of aggravated kidnapping as subdivision (b) of section 209 (Stats. 1976, ch. 1139, § 136.5, p. 5099, operative July 1, 1977), but retained the wording "kidnaps or carries away any individual to commit robbery."

The first judicial attempts to interpret the 1951 statute resulted again in a broad interpretation: "It is the fact, not the distance, of forcible removal which constitutes kidnapping in this state." (*People* v. *Chessman* (1951) 38 Cal.2d 166, 192 [238 P.2d 1001].) Thus, in *People* v. *Wien* (1958) 50 Cal.2d 383 [326 P.2d 457], the court upheld the conviction of a defendant who, in raping and robbing several women, had moved them distances "ranging from a few feet up to more than 50 feet" (*id.*, at p. 400) within their homes. Legal commentators again objected. (*Struggling with Kidnapping, supra,* at pp. 1349-1352.)

---

[5] "Every person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or robbery or to exact from relatives or friends of such person any money or valuable thing, or who aids or abets such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the State prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnapping suffers or suffer bodily harm or shall be punished by imprisonment in the State prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm." (Stats. 1933, ch. 1025, § 1, pp. 2617-2618.)

[6] "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, *or any person who kidnaps or carries away any individual to commit robbery,* or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnapping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm.

"Any person serving a sentence of imprisonment for life without possibility of parole following a conviction under this section as it read prior to the effective date of this act shall be eligible for a release on parole as if he had been sentenced to imprisonment for life with possibility of parole." (Stats. 1951, ch. 1749, § 1, p. 4167, italics added.)

Eleven years later, in the seminal case on the subject, the Supreme Court reconsidered the rule and found that *Chessman* and *Wein* "stand as obstructions" to the flow of "a current of common sense in the construction and application of statutes defining the crime of kidnapping." (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1127.) The court reviewed legal commentary critical of the *Chessman-Wein* approach (*id.,* at p. 1132), proposals by the drafters of the Model Penal Code (*id.,* at pp. 1137-1139), and a recent reinterpretation of the New York kidnapping statute. (*Id.,* at pp. 1134-1137.)[7] In addition, the court reviewed a California Supreme Court decision, *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 P.2d 241], ordering dismissal of simple kidnapping counts where farmworker union picketers chased, pushed and dragged nonunion farmworkers for distances of up to 15 feet. (*People* v. *Daniels, supra,* 71 Cal.2d at pp. 1129-1131.) The court there determined the movements were "natural in" and "incidental to" the riot or assault. (*Id.,* at p. 1130, quoting *Cotton* v. *Superior Court, supra,* 56 Cal.2d at p. 464.)

In light of these developments the *Daniels* court held "the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only 'standstill' robberies but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1139, citation omitted.) Noting the *Wein* court's refusal to "engraft some uncertain distance limitation" onto the plain language of section 209 (*id.,* at p. 1128, quoting *People* v. *Wein, supra,* 50 Cal.2d at p. 400), the court denied that nonmathematical standards are necessarily uncertain. Such standards, the court said, "are not impermissively [*sic*] vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind." (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1129.) But the court rejected a rule framed "in terms of a

---

[7] In *People* v. *Levy* (1965) 15 N.Y.2d 159 [256 N.Y.S.2d 793, 204 N.E.2d. 842], the New York Court of Appeals reversed a judgment of conviction and directed dismissal of the kidnapping counts where victims were moved 27 blocks by car in the space of 20 minutes, expressly limiting application of the kidnapping statute to " 'kidnapping' in the conventional sense" (204 N.E.2d at p. 844) as opposed to movement incidental to various underlying crimes.

In *People* v. *Lombardi* (1967) 20 N.Y.2d 266 [282 N.Y.S.2d 519, 229 N.E.2d. 206], the court applied the *Levy* rule where a pharmacist tricked three young women into taking barbiturates, then drove them from Manhattan to Queens where he sexually assaulted and attempted to rape them. "[T]he court observed [229 N.E.2d at p. 208] that 'the direction of the criminal law has been to limit the scope of the kidnapping statute, with its very substantially more severe penal consequences, to true kidnapping situations and not to apply it to crimes which are essentially robbery, rape or assault and in which some confinement or asportation *occurs as a subsidiary incident.*' (Italics added.)" (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1137.)

specific number of inches or feet or miles" as "open to a charge of arbitrariness." (*Id.,* at p. 1128.)

Unfortunately, while some courts have remained true to the policies expressed in *Daniels,* which require analysis of the circumstances of each case, other decisions have focused on the amount of distance the victim has traveled, blurring the distinction between kidnapping for robbery and simple kidnapping. This can be seen by a review of judicial interpretations of each of the *Daniels* prongs, both of which are required for conviction. (*In re Earley* (1975) 14 Cal.3d 122, 127-129 [120 Cal.Rptr. 881, 534 P.2d 721].)

1. *Movement must be more than merely incidental to the underlying robbery.*

Following *Daniels,* the Supreme Court held kidnapping for robbery did not encompass movements within a home (*People* v. *Hunter* (1971) 4 Cal.3d 432 [93 Cal.Rptr. 746, 482 P.2d 658]) or within a liquor store or service station (*People* v. *Adams* (1971) 4 Cal.3d 429 [93 Cal.Rptr. 745, 482 P.2d 657]). Even a five-block movement in which the car was the situs of the robbery was held to be a "reasonably brief movement for the purpose of facilitating the commission of a robbery. . . ." (*People* v. *Timmons* (1971) 4 Cal.3d 411, 414 [93 Cal.Rptr. 736, 482 P.2d 648].)

Three years later, however, in upholding similar convictions, the court characterized both a one-block walk down a city street and a four-block ride in the victim's car as "substantial asportation" to a "location remote from the place of initial contact," and held "as a matter of law," the movements were not merely incidental to the crime of robbery. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 768 & fn. 20 [114 Cal.Rptr. 467, 523 P.2d 267].) Justice Mosk, the author of *Daniels,* accused the majority of defining " 'another part of the same county' " as a minimum of one city block, "which is no less arbitrary a measure than those condemned in *Daniels.*" (*Id.* at p. 777, conc. and dis. opn. of Mosk, J., citing *People* v. *Daniels, supra,* 71 Cal.2d at p. 1128.)

The change in focus was completed in *In re Earley, supra,* 14 Cal.3d 122, where the court upheld a conviction in which the defendant, using a gun-like cigarette lighter, entered the victim's automobile at an intersection and drove 10 to 13 blocks before taking a watch and wallet, then fled on foot. The court observed: "Movement of that distance or less has been expressly or impliedly viewed as substantial rather than brief in cases involving section 209 [citations] and section 207 [citation]. Since the movement here was substantial, it was not 'merely incidental to the commission of robbery,' even though it may have been solely to facilitate the commission of the

robbery." (*Id.,* at p. 130, citations & fn. omitted.) The court also determined the *Timmons* holding that a five-block forced movement to facilitate robbery was brief and incidental thereto had been "impliedly overruled" by *Thornton.* (*Id.,* at p. 131.) Again Justice Mosk dissented, commenting that "[t]he sensitive inquiry envisaged by *Daniels* into whether the movement was criminologically significant seems to have been abandoned in favor of the crude and arbitrary rule of 'one block, one conviction.'" (*Id.,* at p. 135, dis. opn. of Mosk, J.)

In the 13 years since *Earley* we have received no additional guidance from the Supreme Court as to whether "merely incidental" movement is to be defined solely or primarily in terms of "substantial distance." If it is, it is difficult to distinguish the first prong of the *Daniels* test from the test for simple kidnapping.

In *People* v. *Stanworth* (1974) 11 Cal.3d 588 [114 Cal.Rptr. 250, 522 P.2d 1058], the court attempted to define the degree of asportation necessary to constitute simple kidnapping and concluded, "The statutory language implies that the determining factor in the crime of kidnapping is the actual distance of the victim's movements; and further, that the minimum movements necessary for the commission of the crime are present where the victim is forcibly taken 'into *another part* of the same county.' (Italics added.) Finally, because the victim's movements must be more than slight [citation] or 'trivial' [citation], they must be substantial in character to constitute kidnapping under section 207." (*Id.,* at p. 601.) The court held the *Daniels* rule inapplicable to simple kidnapping charged as a violation of section 207 (*id.,* at pp. 596, 598-599), and specifically, that the first, or "movement of the victim" prong of the *Daniels* test, although derived from a simple kidnapping case, "is by its very terms inapplicable to section 207." (*Id.,* at p. 599.)

Nevertheless, cases involving both simple and aggravated kidnapping have been used to define the "substantial movement" requirement of simple kidnapping. (*People* v. *Green* (1980) 27 Cal.3d 1, 66 [164 Cal.Rptr. 1, 609 P.2d 468].) Moreover, lower courts purporting to observe the distinction (see, e.g., *People* v. *John* (1983) 149 Cal.App.3d 798, 807-810 [197 Cal.Rptr. 340], and cases cited therein) seem to have difficulty understanding and applying it.[8] Finally, the *Earley* court's determination that even movement

---

[8] We note that the same confusion occurs when movement of the victim is followed by offenses other than robbery. It arises with considerable frequency when the movement is followed by the commission of a sexual offense, which raises the question whether the movement was sufficient to constitute a kidnapping under Penal Code section 207, subdivision (a), or even an enhancement for kidnapping for the purpose of committing a sexual offense under Penal Code section 667.8, subdivision (a). This area of the law also requires clarification.

made solely to facilitate the commission of robbery was not merely incidental thereto because it was substantial (*In re Earley, supra*, 14 Cal.3d at p. 130) all but equates the kidnapping substantial movement requirement and the *Daniels* incidental test. (See also *id.,* at pp. 128-129.) We need a rule that clearly delineates when a movement is sufficient for the crime to become kidnapping for robbery. While distance should be a factor in the determination, the better rule would seem to be that it should not be the sole factor.[9]

### 2. *Movement must substantially increase the risk of harm over and above that of the underlying crime.*

The *Daniels* court determined there was no substantial increase in the risk of harm from the forced movements of three women inside their homes. (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1140.) The fact the victims were all raped was not considered relevant to the determination, evidently because the court considered the movements "a subsidiary incident" to the rapes as well. (See fn. 7, *ante.*)

 In *People* v. *Timmons, supra,* 4 Cal.3d at page 415, the court explained "[t]he true test in each case is not mere mileage but whether the movements of the victims '*substantially* increase the risk of harm' beyond that inherent in the crime of robbery itself. (Italics added; [citation].) Again the qualifier is significant." In *Timmons* the victims drove five blocks along a city street in broad daylight while the unarmed defendant, without harming either victim, relieved them of their money and then exited the car to rendezvous with his accomplice. Contrasting these facts with those in *People* v. *Ramirez* (1969) 2 Cal.App.3d 345 [82 Cal.Rptr. 665], where defendants' attempt to outrun police with their intended rape victim in the car resulted in an auto accident (*People* v. *Timmons, supra,* 4 Cal.3d at p. 415), the court concluded "In the circumstances, this brief asportation may conceivably have increased the risk in some slight degree beyond that inherent in the commission of the robberies, but it cannot be said to have 'substantially' increased that risk." (*Id.,* at p. 416, fn. omitted.)

Several subsequent cases followed *Timmons* in requiring facts showing that forced movement of the victim actually and substantially increased the

[9] Not only does kidnapping for robbery overlap with simple kidnapping, it also overlaps with robbery. (Pen. Code, § 211.) "[I]t is settled that the crime of robbery is not confined to the act of taking property from victims. . . . [it] is not complete until the robber has won his way to place of temporary safety." (*People* v. *Carroll* (1970) 1 Cal.3d 581, 585 [83 Cal.Rptr. 176, 463 P.2d 400].) Thus, kidnapping for robbery convictions have been upheld where the forced movement took place after the taking of the victim's property. (See e.g., *People* v. *Beaumaster* (1971) 17 Cal.App.3d 996, 1004 [95 Cal.Rptr. 360]; *In re Bryant* (1971) 19 Cal.App.3d 933, 935-936 [97 Cal.Rptr. 40].)

risk to the victim. (See, e.g., *People* v. *Beamon* (1973) 8 Cal.3d 625, 636 [105 Cal.Rptr. 681, 504 P.2d 905] [conviction upheld; robbery victim forced to floor of truck cab and threatened and beaten with gun when he tried to reach his own gun under seat]; *People* v. *Mutch* (1971) 4 Cal.3d 389, 397-398 [93 Cal.Rptr. 721, 482 P.2d 633] [conviction overturned although victim was pistol whipped; court held this was a risk inherent in armed robbery]; *People* v. *Milan* (1973) 9 Cal.3d 185, 192-193 [107 Cal.Rptr. 68, 507 P.2d 956] [conviction upheld; defendant fired shots through front window of taxi after driver tried to attract police attention by repeatedly committing traffic violations].)

But later cases have substantially modified *Timmons*. Without discussion the majority in *People* v. *Thornton, supra,* 11 Cal.3d at page 768, concluded "any substantial asportation which involves forcible control of the robbery victim such as that occurring in this case exposes her to grave risks of harm to which she would not have been subject had the robbery occurred at the point of initial contact." In his dissent Justice Mosk noted that since forcible control is an essential ingredient of all kidnaps, "a definition couched merely in terms of forcible control fails to distinguish between simple and aggravated kidnapping." (*Id.,* at p. 777, dis. opn. of Mosk, J.)

In *People* v. *Lara* (1974) 12 Cal.3d 903, 908 [117 Cal.Rptr. 549, 528 P.2d 365], the majority found "a substantially increased potential for serious harm" where "the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon." Again Justice Mosk disagreed, stating "such a threat is a common method by which the victim of a simple kidnapping under section 207 is persuaded to accompany his or her abductor." (*Id.,* at p. 910, dis. opn. of Mosk, J.)

The court in *In re Earley, supra,* 14 Cal.3d at page 131, cited *Lara* with approval and also held the test could be satisfied in the absence of a deadly weapon, citing *People* v. *Thornton, supra,* 11 Cal.3d at pages 750, 767-768. Distinguishing *Timmons* on the facts, it determined the risk element was satisfied where the defendant, wearing sunglasses, drove 10 to 13 blocks at night from lighted intersections to dark side streets holding an apparent weapon in one hand, and presumably dividing his attention between the victim (whom he threatened to kill) and the road. The court hypothesized that in these circumstances, an auto accident might occur, or the victim might attempt to escape or be pushed from the moving car. (*In re Earley, supra,* 14 Cal.3d at pp. 132-133.)

Justice Mosk responded that speculative danger does not suffice. There must be a factual basis for believing the dangers were real, a "factual basis which is entirely lacking in the majority's speculations." (*Id.,* at p. 136, dis.

opn. of Mosk, J.) Emphasizing "the immense practical differences" between the penalties for simple and aggravated kidnapping (*id.,* at p. 138),[10] he concluded the disparity in penalties "furnishes the yardstick by which to judge how 'substantial' must be the increase in risk of harm in order to support a conviction under section 209: the increase . . . must be proportionate to the difference in penalties." (*Id.,* at p. 139.)

We agree with Justice Mosk that *Thornton* and *Earley* have broadened the *Daniels* rule so as to permit convictions under the aggravated kidnapping statute for behavior amounting to simple kidnap and robbery. (Compare risk analysis in *People* v. *Mutch, supra,* 4 Cal.3d at pp. 397-398, with that in *In re Earley, supra,* 14 Cal.3d at pp. 131-133.) On the other hand, even the most casual observer of contemporary criminal activity must note an increase in the commission of crimes, often with violence, by defendants who are substance abusers in possession of weapons. With such defendants it could be argued that any movement increases the risk of harm to the victim. Considering these circumstances of life in the 1980's, and 24-hour-a-day access to automated teller machines for which the victims of robbery increasingly possess bank cards, it becomes clear that the facts in this case cannot be considered an abnormal or isolated kind of criminal conduct. Indeed, this case may simply represent the emerging tip of a large iceberg.

Our concern for dispensation of justice forces us to suggest that the Supreme Court consider the formulation of a rule that fairly identifies the proper scope of Penal Code section 209 in a manner that lends itself to consistent application by the lower courts. We acknowledge the difficulty of the task. However, the need for guidance is compelling (particularly with the advent of automatic teller machines, a situation not existing at the time of *Earley* or *Daniels*). We must have a clearer line drawn to distinguish when robbery becomes kidnapping for robbery and how to distinguish simple kidnapping. A rule that makes the deciding factor the number of feet a victim is moved may subject two similar acts to significantly different penalties.

B. *Application of the Law to the Present Case.*

In the present case Daniels contends the evidence of Pena's forced movement to the Bank of America Versateller machine was insufficient to warrant a conviction of kidnapping for robbery. He asserts the *Daniels* test applies, as construed in *People* v. *Timmons, supra,* 4 Cal.3d 411. The Attorney General responds that *Timmons* has been "impliedly overruled" by

---

[10] For current penalty disparities, see *ante,* footnote 2, page 675.

*Thornton* (*In re Earley, supra,* 14 Cal.3d at p. 131) and alternatively that *Timmons* can be distinguished on the facts.

Indeed, courts have expressed some confusion as to whether *Timmons* is still good law. (*People* v. *John, supra,* 149 Cal.App.3d at p. 806 fn. 4). The *Earley* court held the *Timmons* holding on the incidental prong of *Daniels* had been "impliedly overruled" by later decisions. (*In re Earley, supra,* 14 Cal.3d at p. 131.) However, in its discussion of the *Daniels* risk-analysis prong *Earley* distinguished *Timmons* on its facts. (*Id.,* at p. 132.) ■ *Timmons* therefore still appears to have application to the issue of whether the forced movements of victims have substantially increased the risk of danger over and above the risk in the underlying robbery.

1. *While the initial movement around the corner to search Pena more fully was incidental to the robbery, the subsequent three or four block movement to the Versateller machine was not.*

■ After asking for money outside the ARCO Mini Market and receiving only two dollars in change, Daniels searched Pena's pockets. Evidently fearful that he would be seen, he directed Pena to drive around the corner to a residential area, there conducting a more thorough search of Pena and his car. The movement from the market for one-half block was incidental to a continuing robbery under the "brief movements to facilitate [a] robbery" standard of *In re Earley, supra,* 14 Cal.3d at page 129. However, forcing Pena to drive three or four blocks to the Versateller machine for the purpose of effecting a robbery was movement for a substantial distance "even though it may have been solely to facilitate the commission of the robbery." (*Id.,* at p. 130, fn. omitted. See also *People* v. *Thornton, supra,* 11 Cal.3d at pp. 767-768 & fn. 20.)

2. *The circumstances of the movement to the Bank of America were sufficient to increase substantially the risk to Pena over that of the underlying robbery.*

Daniels contends there was no substantial increase in the risk of harm to Pena because Pena drove at normal speeds during daylight hours to a public place (a shopping mall) and was threatened only with what later proved to be an unloaded gun. The record shows Daniels poked Pena on the forehead using a jabbing motion with the muzzle end of the gun approximately a dozen times leaving abrasions and a lump. ■ The second prong of the *Daniels* test is satisfied where a victim is forced to travel a substantial distance under a threat of imminent injury by a deadly weapon. (*In re Early, supra,* 14 Cal.3d at p. 131.) ■ Being jabbed with a gun which

the victim had no reason to know was unloaded might have caused Pena to try to escape or to drive erratically, which could have caused an accident. "The fact that these dangers did not materialize does not . . . mean that the risk of harm was not increased." (*Id.,* at p. 132.)

While the approach originally intended by *Daniels,* analyzing the circumstances of each case and requiring an actual and substantial increase in risk would appear fairer under the facts of this case and may have provided a different result, we must follow the law as it now exists. The judgment is supported by current law.

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 14, 1988. Mosk, J., was of the opinion that the petition should be granted.